And our final case for argument this morning is United States v. Reyna. Mr. Pennington, whenever you're ready. Good morning. May it please the court. Good afternoon. Sorry. May it please the court. Chad Pennington on behalf of the appellant here. Mr. Jose Reyna. Your Honor, this case represents a narrow, rather straightforward request for relief, but an important one constitutionally. And we ask that this court apply the Second Amendment's plain text to the statute for which Mr. Reyna was charged, Section 922K, unlike the district court, and apply it as Bruin directs. This court should reverse for two fundamental reasons. First, a reversal here and a remand would ensure that district courts, when confronted with the Second Amendment challenge, apply text as directed at the first portion of the Bruin challenge. And second, to ensure that district courts do not consider matters extrinsic to text, such as means and balancing, such as the social utility of a firearm regulation, the investigatory benefits, and even history. History itself, Your Honors, is reserved for the second part of the Bruin test. I think that misreads Bruin very little about the Second Amendment's text. We'll resolve any case without further inquiry into the meaning of that text based on a historical analysis and an analysis of the legal tradition at the time, the background legal tradition that informed the founding generation in adopting the Second Amendment. The text of the Second Amendment itself is never going to resolve any question. So I think you're over-reading that language from Bruin that focuses on the scope question that begins the analysis. The scope of the right needs to be determined as a threshold matter to address arguments, usually from the government, that the regulated conduct falls outside the scope of the right and were to examine the founding era, history, and legal tradition to determine, to answer that question. And then the second step is the government's justification for the regulation, and we now know that that has to be keyed to an analysis of similar or analogous regulations in our history and legal tradition rather than any kind of means and fit kind of a justification, as in the First Amendment context. So nothing is answered by the text alone is my basic point, and that seems to be the thrust of your argument. Your Honor, I would agree that text doesn't control the outcome necessarily under the Bruin analysis. It's text and its history. And the historical tradition of firearm regulation at step two, that definitely would dispose of a number of firearm regulations, absolutely. But I think the Supreme Court in both Heller and in Bruin stated that when you look at the textual analysis, you apply the ordinary and plain meaning of the text of the Second Amendment and you apply that to the actual. No, the court in both cases says that there's an initial question about the scope of the right. And in Heller, what kind of a right it is, an individual right or a collective right adhering in malicious service? That's a question about the scope and meaning of the right. The application questions and the government's justifications for firearms regulations are the second step analysis. So both steps are completely informed by founding era, history, and legal tradition. And in some cases, history and legal tradition predating the founding era or postdating the founding era. We're not exactly sure, but we're working it out. So maybe you could situate your argument within that textual and history and legal tradition form of analysis at the threshold question about the scope of the right and whether possession of a firearm with an obliterated serial number falls within the scope of the right or outside the scope of the right as a matter of our history and legal tradition. Certainly, Your Honor, I think there's no doubt that the district courts, to answer your question in a more elaborate way, I think there's no doubt that the district courts, they are struggling with Bruin. In our district, there's been a fair amount of Bruin litigation. And what exactly are the contours of the Second Amendment right post-Bruin? District courts are struggling with that. And there is some confusion with what exactly the first step entails as it relates to the second step. Assuming that we do consider the scope of the right as a plain text analysis at step one, what the court has said is the right protects those firearms that are commonly used for defensive purposes. And that was understood within the historical context because what was commonly used for defensive purposes then accords with history because it excludes those dangerous and unusual weapons. And dangerous and unusuality in this context, they're referring to military weapons. They're referring to the certain kinds of weapons that were designed expressly for a military purpose. The reason that our challenge here doesn't fall within that particular ambit is because a firearm with a serial number, without a serial number, it remains a firearm. It doesn't affect its functionality. It doesn't affect its range, its capacity. It remains a firearm. It's not the sort of weapon that was designed specifically for military purpose or military capability. So if you apply the common use standard and the standard of whether a weapon accords with the historical understanding. I'm not following your argument. Are you suggesting that weapons that are appropriate for common defense are excluded from the right? No, Your Honor. Weapons that are in common use today and then for defensive purposes. Community defense, military purposes, militia. Militia. Well, I would say for defensive purposes within the home, defensive purposes within property. The right clearly applies to weapons that were in common use by the militia when summoned from the people who possess the right to keep and bear arms for personal defense and for use in militia service. That's the whole point of the militia class. To codify the common understanding that all able-bodied men at the time were expected to muster for a militia service when called to do so. And they were to bring their personal firearms for that purpose because there was no standing army. Certainly, Your Honor. So weapons that are appropriate for common defense, community defense in the form of militia service are categorically within the core of the right. I would agree, Your Honor. Those are within the category or the core of the right. I thought I heard you just say that weapons that are appropriate for military use are outside the right. That are designed specifically for a military purpose are excluded from the right, Your Honor. How can that possibly be consistent with the founding era understanding of the Second Amendment right? Those are the kind of weapons that are understood to be dangerous and unusual, Your Honor. No. The founding era used that understanding or the understanding of those sorts of weapons were weapons that were useful only for private or criminal purposes, private conflicts as opposed to public conflicts, militia service, or were only useful for criminal purposes, not militia service. Your Honor, which… I've got it exactly backwards. I'm sorry, Your Honor. I don't know that this is relevant to your argument, but to the extent that you're arguing that weapons that were useful for military purposes, in other words, militia purposes, were outside the scope of the right, that's exactly backwards. Your Honor, the weapons that were designed at the time of the founding, the early republic, those weapons had a capacity and they were designed for potentially use of the militia, which was quasi-military. They also had a design functionality intended for use on the frontier, for use at the home. What we're saying is those weapons that were designed specifically and expressly and only for military purposes… There were no such things back then because there was only the militia. Your Honor… Eventually, there was a continental army that was equipped by the government, but the weapons were no different than those that were used by people in their homes. I think, Your Honor, your line of questioning demonstrates why a remand is necessary here. Because to flush out these historical sources, to have expert declarations, just like Atkinson's advised, to consider those five zones of historical evidence, that's why a remand is necessary here. When we look at… What do you make of Hillard's statement that… Your Honor, our position as to that statement of Hillard is that that is engrafted from Miller, and in that particular case, Miller, the court said that the Second Amendment right doesn't apply to any sort of weapon design. Hillard comes along and says that is still good law because that accords with our historical understanding of the scope of the right. So, Your Honor, I would say that that is absolutely a valid consideration. I don't think the Second Amendment confers the right to keep every sort of weapon a person may want. But that's a question of history, and that's a question that needs to be resolved as a second step. But in reaching that conclusion, wasn't the court basically interpreting… You say focus on the text, right? But I think Chief Judge Sykes makes a really good point, which is you have to interpret the text based upon the historical context at the time, right? What was the thinking of the people at the time with regard to the scope of that right? So isn't the Supreme Court, in announcing that, isn't it doing exactly what you want us to do, which is look at the text? And the only way we can figure out what the text means is to consider the historical meaning and the context at the time those words were used. It seems to me that what you're asking us to do in step one is precisely what Chief Judge Sykes should do with regard to, and I think we should do with regard to, defining first scope of it. Your Honor, to answer your question, I think that… It's nearly impossible to figure out what the words mean without reference to the historical context in which those words were used. I would agree, Your Honor, and that's where we can go to the second step of Bruin. The Supreme Court in Bruin did state that when you look at the text of the Constitution, the Second Amendment specifically, you apply its plain and ordinary meaning. And the outer limits of the right, based on the textual meaning, that's defined by history. Plain and ordinary meaning at the time the words were used, right? And so then with the rebel, what was that plain and ordinary meaning at the time the words were used? And for that, we have to refer to the historical context. To define the scope of the right, correct, Your Honor. To better understand what was meant by those words, by the text. Your Honor, I think to answer your question as it relates specifically to the district court's decision here, not necessarily discounting that there's a role for history to ground or more at the constitutional text at step one. What I don't think step one permits is the type of balancing the district court did here. What kinds of weapons are typically possessed or what is commonly possessed? That implies some metric of measurement, some quantum that you have to— Does the Bruin say, though, that we have to look at, based on what Keller did, that we have to look at the type of what weapons that law-abiding citizens typically possessed at the time to determine what the scope of the right is? Your Honor, that's correct. I would say that that could be fit within the second part of the Bruin analysis. That's how we define what the scope of the right is. By looking, again, at what a law-abiding citizen would have used back at the time. Well, I don't, Your Honor, think that we could look at necessarily what a law-abiding citizen would have used back at the time of the founding as dispositive. The Bruin specifically says that the protections as to weapons apply to the weapons in existence today, just as they existed at the time of the founding. I would say that, Your Honor, the point I was trying to make earlier, Judge Sykes, is there's the common use standard. And in Heller and in Bruin, as reiterated, the right protected those weapons that are in common use today for the purposes of self-defense. And that standard exists because it excludes those weapons which are dangerous and unusual. Those weapons that are dangerous and unusual, those are the ones that fall outside the scope of the Second Amendment protections. Because that accords with the historical tradition. So you could use that. But that might be true, but it doesn't adjust those. If they're not dangerous and unusual, but they're not in common use, they don't fall with it. Your Honor, the Supreme Court of Bruin seemed to suggest that common use, what excludes something from common use is it's dangerous and unusuality, based on Miller. I don't read anything of good to limit it to just dangerous weapons. Or dangerous and unusual. Dangerous and unusual. Certainly. There's nothing that said that common use equates with what is not dangerous and unusual. Well, if it's common use, Your Honor, then it's not dangerous and unusual. But what the court is saying in Heller and Bruin is specifically that the right protected is those weapons that are commonly used for defensive purposes. And the way that you gauge that is by examining the historical limits. And in this particular case, the district court engaged in what is typically possessed by law enforcement, or pardon me, what's typically possessed by law-abiding persons. That's not a textual analysis. That's getting into the weighing of the historical evidence. And I agree, if we remand to Step 2, district court may ultimately find that the law is situated in the history. Do you think we define Step 1? Your Honor, I think we define Step 1 as the Supreme Court says you do. And that is, you look at the Second Amendment's plain text and you apply it to the individual conduct at issue. The Second Amendment's plain text answers zero questions. In real cases. I understand the court's concern. We know that it's an individual right, not a collective right, and it applies against the states. That's all we know so far. The rest is worked out through historical analysis and an analysis of what's consistent with our legal tradition. Both as regards to the scope of the right and as regards the limits on the government's ability to regulate it. That's shorthand for the two steps that Bruin described. Your Honor, may I briefly conclude? The Second Amendment says what it says. It provides the operative clause a right to keep and bear arms. That's what it says. The limits of the right, those are defined by history, and that's a Bruin Step 2 analysis. Thank you, Your Honor. Thank you. Mr. Holler, good afternoon. Good afternoon, Your Honors, and may it please the court. David Holler on behalf of the United States. The Second Amendment permits a legislature to require the serialization of firearms and equally permits it to ban interference with that scheme. The test that is set forth in Bruin, which the court in Bruin said was completely consistent with Heller, is two parts, as this court knows. And the first question is, does the Second Amendment's plain text cover the conduct? The second step is, if it does, does the law square with the nation's tradition of regulations? As explained in our brief, the government believes we win on both parts of the test, but the court need not reach the second part of the test, and the district court did not reach the second part of the test, excuse me, because the government prevails on the first part. And I agree that there is a lot left open and opaque by Heller and by McDonald and by Bruin. Some of those questions may be resolved by Rahimi. Some of them are going to be resolved by these courts. But I do think that there is a reasonable explanation of how the Supreme Court interprets the first step of the test. And the clearest indication of that is on pages 622 through 627 of Heller, where the court explains the holding of Miller and explains how that holding is consistent with Heller and therefore also with Bruin. And then its ultimate explanation of why the arms that were at issue in Heller did come within the text of the right, while sawed-off shotguns, which is what was at issue in Miller, did not come within the right. So Heller stated that the Second Amendment confers an individual right to keep and bear arms, though only arms that have some reasonable relationship to the preservation or efficiency of a well-regulated militia. It further stated that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. And it went on to state that the important limitation, this is the step one limit, this is on page 627, what it did protect were the sort of weapons in common use at the time, and that holding, that it was weapons in common use, was supported by a historical tradition of prohibiting the carrying of dangerous and unusual weapons. That's the only mention in Heller of dangerous and unusual, and the only mention in Bruin is essentially a follow-up quoting Heller. So dangerous and unusual supports what the text of the Second Amendment means. And what the text of the Second Amendment means is, were they in common use? So that's the question that the court has to ask, is were they, are they, and then what the court goes on to say is, we're not asking were handguns in common use in 1791. We're bringing everything to a reasonable analog. So we're asking in 2023, are the weapons that this particular legislative scheme is prohibiting, are those in common use? And it's not asking in general, are shotguns in common use by law-abiding citizens? It's asking, are sawed-off shotguns in common use? And the answer is no, they're not. And therefore, you know, Heller said, Miller is right. Sawed-off shotguns are still out. We're not suggesting that sawed-off shotguns are okay just because shotguns are in common use and because the government can't prove that in 1791 there was some law that prevented people from sawing off their shotgun. So that's the test. So then if we apply that test to obliterated serial numbers, the government would submit it comes out the same way as sawed-off shotguns. These are not weapons that are in common use, just like sawed-off shotguns are not in common use. And these weapons are commonly used for criminal purposes. They are used by criminals because it is then possible to ditch your firearm after you commit a crime and not have it traced back to you. That's what Marzella said. That's the reasons why these statutes have historically been implemented. And so for all those reasons, deserialized firearms, just like sawed-off shotguns, are not commonly possessed by law-abiding citizens for lawful purposes. And I would say that that's the analysis that essentially decides this case. I think that's essentially the analysis that decided this case for the district court. You say that we look at weapons used today in 2023. What role does history play in that first problem? Well, I think history essentially was used by the Supreme Court to define what weapons fall within the definition of protected arms. So the Supreme Court, I think, has sort of done the historical analysis at the first step, and it hasn't done the historical analysis at the second step, which is why the lower courts are being tasked with all of that burden. Historical analysis is coming up with the common use, and we don't have to do anything else at step one in terms of history. I don't think that the court really does have to do anything else with step one in history. I mean, this is just the general nature of how the legal process proceeds, right? I mean, the courts in general look at the law and look at what the constitutional provision meant at the time. And then if the Supreme Court hasn't done it, that's what the courts of appeals or the district courts do. And then once that historical purpose has been determined, then that's the law. And to be clear, I think that we are still at step one having to look at history in defining what the people is, which is what most of the cases that we're now looking at are focusing on. Are felons part of the people? Are people under indictment part of the people? We kind of need to look back at history to do that. And had the Supreme Court not done in Heller what it did to try to define what arms are, this court would be doing the same thing. But the Supreme Court's done a lot of that already. But Heller was not the court's last word on the scope of the right as it pertains to what sorts of arms are protected or within the scope of the right. The amendment doesn't protect guns, it protects people, just like the Fourth Amendment doesn't protect places, it protects people. But that wasn't the court's last word on the scope of the right as it pertains to questions about what form of weapons, what kinds of arms are categorically protected and what kinds may be categorically unprotected. I agree with that. So if there was some evidence that firearms with obliterated serial numbers were categorically permitted back in the 1790s, then I mean, that would be relevant evidence. But there's no evidence of that. Serial numbers weren't really placed on firearms until about the 1840s. And to the extent that we have historical evidence on that point, we do have the statutes from the early 1800s involving, you know, barrel proofs and barrel markings and nobody nobody suggested that any of that was unconstitutional. We had marking of gunpowder, which was essential to use your musket. If you didn't have gunpowder, you didn't you didn't really have a fire. I mean, you didn't really have a weapon. You didn't really have an arm because your musket was useless. So and and marking of those things was permitted. Commercial regulations were permitted to the extent one one looks at the militia context. There were censuses and and listings, you know, by hand of the firearms that were going to be used by the militia. Right. But what were the purpose of those regulations when militiamen were expected to show up and present their arms for inspection and marking? That wasn't. That doesn't map on to the purpose behind the serial number obliteration ban that's being enforced here. Well, it doesn't perfectly map on onto that ban. I certainly agree with that, but it's it's still a relevant analog. I mean, to the extent that it doesn't map onto that that ban, it's because we didn't have detective agencies. We didn't have the ability to trace firearms. I mean, to some extent, firearms in American firearms, at least in the 1790s, were all unique. They were all individually crafted by gunsmiths. So and and transportation was hard. So if you recovered a gun to the extent any early constable or the private citizens who were or the state actors who were engaging in those kinds of activities, you would be able to identify the firearm. You'd be able to identify by its characteristics who had made it. You'd probably be able to go back to that person and identify it. It was only with the rise of mass production that you would even that you would even need to serialize firearms. And once serialization came into play, everybody seemed to think that it was fine for that purpose. There's no evidence that anybody ever thought that this was a problem that infringed on any anybody's Second Amendment rights. So for all of those reasons, I think that there are relevant analogs that that do exist. I mean, Keller and Bruin sort of said, look, there were there were common issues regarding possession of firearms. And so we look at those analogs and they didn't permit the wholesale banning of keeping firearms in your home and they didn't keep the. Carrying firearms on your person, but there are limited classes of arms that can be restricted. These are arms that are not in common use, and it isn't an infringement on anyone's rights to at least as that would have been understood at the time of the Second Amendment to require marking of your firearm. The fact that we're not in common use and or are dangerous and unusual. Right. One or the other. But firearms with obliterated serial numbers are not in common use. They are unusual. And I don't know. Dangerous. I mean, all firearms are dangerous. So I think by dangerous, that's shorthand for adaptable to criminal purposes, because that was always thought to be regulable. Right. I think that that's true, Your Honor. I mean, I think the defense in many of these cases has wanted to turn dangerous and unusual into unusually dangerous. And I don't I don't see that anywhere in any of the Supreme Court cases. And I would agree with that. But the regulation issue here, the criminal statute issue here prohibits possession of a firearm with a filed off serial number. And those firearms, you argue, are not in common use. They're only used by the criminal element, which strikes me as satisfying both components of the Supreme Court's description of the types of arms that would fall outside the scope. Right. Those that are not in common use and that are dangerous and unusual in the sense that they are adaptable and used by the criminal element. I would agree with that. They're not common. They're not in common use. They are adaptable for the criminal element. As a general matter, by determining the scope question, the threshold scope question at a higher level of generality, then we describe or define the second step question, which is the extent of the government's ability to regulate. There we have to look for something that's meaningfully analogous, relevantly analogous to use the court's words in Bruin. But the first question is a different sort of analogic reasoning. It appears to me that it's at a higher level of reasoning. It's a bit more of a quick look or a higher level. It's not asking. I don't I don't see anything in Heller or Bruin suggesting that on the first step, you're supposed to be doing that deep of a historical dive and trying to create an exact match to some prior regulation. You are doing it that at the second step. And we have at the second step offered the best analogs that we can to to those tests. The gunpowder regulations, the trade regulations, the barrel markings, all of those things. And I think, therefore, we would prevail at that step as well. But I don't think the court needs to get there. Well, what we're really looking for is some historical information or information from our legal tradition that would give meaning or content to the scope of the right, as opposed to looking for a specific analog to the modern day regulation. And that's a little hazy. And we're all sort of slipping into trying to read the Supreme Court's opinions in this area as statutes, which they shouldn't be read as statutes. They're opinions that contain common law like reasoning and that that's leading us with uncertain guideposts to how to proceed. If we have to get to step two, if we say that this statute, the government hasn't carried its burden of establishing that this statute regulates conduct that falls categorically outside the scope of the right. And I know you have a burden of proof argument in your brief. If you want to spend a minute on that, go ahead and then address step two. Sure, Your Honor. Well, the court obviously has not stated who has the burden on step one. The only guidepost and I am sure the Supreme Court will give us guideposts. The first point I would state is I don't think that the burden matters here. I think even if the burden were on us, I think we have met our burden. But to the extent that the court feels a need to establish the burden on step one, the court compared this to the First Amendment. In the First Amendment context, it is the defendant's burden to or the challenger of the statute. Most of these cases obviously arise in the civil context. It's the challenger's burden to establish that it falls within the right. And then it's the government's burden. Certainly in the expressive conduct line of cases, which are the, that's the case that you cite from the 1980s, if the challenges or the government's regulating conduct and the individual claims that my conduct was expressive in nature, then that individual bears the burden of establishing that his conduct is expressive in nature and therefore falls within the scope of the right. If the regulation is operating on speech itself, then it's the government's burden all the way down. Well, there doesn't have to be a prima facie showing that by the claimant. I mean, Bruin is a bit of a new case. So we're trying to map this back onto the First Amendment, Your Honor. But the way that we view it is the First Amendment regulates speech. And so it's the defendant's burden to show that it's speech. So does expressive conduct fall within speech? So that's the question analogously. Do firearms with obliterated serial number fall within arms? That's where we analogize. And then once they've shown that, once they've shown that step one, then agree the burden falls on us. So in most First Amendment context, there's not going to be much dispute that the claimant was speaking. So we don't have a lot of first step cases. And we're probably not going to have a ton of first step act cases in the Second Amendment context once the Supreme Court gives us a few more guideposts as to exactly who are the people and exactly what is an infringement. But even in the Supreme Court's more modern First Amendment cases, in particular, the violent video games case and the Crush Videos case and those Brown and Stevens and so forth, those place the burden squarely on the government when the government is arguing that this conduct falls categorically outside the scope of the First Amendment right. The Supreme Court has always held the government to the burden or assigned the burden to the government on that threshold scope question, the categorical question about whether this is in or out, and then to the whatever doctrinal analysis follows. Once they've determined, as I think that they have, that that kind of expressive conduct of speech, then, of course, the burden is on us. So, again, I think that's just at that early stage. Again, I think either way, I think if the burden falls on us, we've met our burden here. I don't think that that issue really needs to be resolved in this case. Mr. Miller, is there any reason we should wait until after the Supreme Court rules in Rahimi to reach this case? I think my answer to that question would be that if the court agrees with the district court's analysis and our analysis that this is a step one case, then no, it should not, because I think the court has laid out that analysis sufficiently to define for purposes of this case what arms is. Rahimi involves a flat-out ban, so I don't really think the Supreme Court is going to extensively flush out anything about what an arm is or what it means to infringe the right to arms. There's no doubt that the regulation in Rahimi G-8 infringes the right to arms. I don't think the Supreme Court is going to say anything relevant to that issue. If the court were to decide that we do not prevail, the district court was incorrect, and to go on to the second step, I think it would be up to this court. I think the Supreme Court might well discuss that second step in some detail because that's the step that has predominantly caused confusion in the lower courts. So if the court were to go on and reach that second step, I think our historical analogs provide strong evidence, and my view would be that we prevail whatever the Supreme Court is going to say, but I certainly could see this Supreme Court wanting to wait. Thank you, Your Honors. We'd ask the judgment be affirmed. Mr. Pennington. Thank you, Your Honor. But I'll just note that the Supreme Court has said that the Second Amendment applies or extends prima facie to all instruments that constitute a bearable arms, even those that are not at the time of the founding. A firearm without a serial number would constitute a bearable arm. It would fall within the first step of the analysis, Your Honor. Also, I think the government said that we are trying to So with machine guns. Potentially, Your Honor, and their exclusion, if it's grounded in history, that would be the test. I would say that the Supreme Court really meant it. Certainly. In finality, with respect to whether the Step 1 consideration can consider dangerous and unusual standard and other forms of history, I would offer the patent case out of the District of Nebraska. That's 2023 Westlaw 623-0413. That specifically stated that the question of dangerous and unusuality, that's reserved for Step 2, which is exactly our argument here, Your Honor, that this is a straight textual analysis. We would ask that you reverse. Thank you. Our thanks to both counsel. The case is taken under advisement. And that concludes our calendar for today. The court is in recess.